UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LILLIE WESTON,

                        Plaintiff,          **MEMORANDUM
AND ORDER**
           -against-                       CV 03-5430 (ARL)

UNITED STATES OF AMERICA,

                        Defendant.
-------------------------------------------------------------X
**APPEARANCES:**

**STEVEN LANE, ESQ.**
**MOORE & LANE, L.L.P.**
Attorneys for Plaintiff
75 Jackson Avenue
Syosset, New York 11791

**ROSYLYNN R. MAUSKOPF**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
**by TIMOTHY LYNCH**
Attorneys for Defendant
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201

**LINDSAY, Magistrate Judge:**

      The plaintiff, Lillie Weston ("Weston"), commenced this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. ("FTCA"). The plaintiff claims that she was injured as a result of the defendant's negligence in the maintenance of its post office located in Mineola, New York. Modified Joint Pretrial Order at 2. Specifically, the plaintiff asserts that the defendant failed to keep the post office in good repair and/or a safe condition by permitting a portion of the pavement in front of the post office to remain cracked and broken despite notice of the defect. *Id.* The defendant denies that there was any defective condition on the premises that caused the injuries for which Ms. Weston is seeking compensation.

*Id.* The government asserts that any injuries sustained by the plaintiff were the result of her own negligence when she decided to sit on a ledge. *Id.*

A "Notice, Consent, and Order of Reference for the Exercise of Jurisdiction by a United States Magistrate Judge" was signed by both parties and approved by District Judge Platt on January 18, 2007. Accordingly, this matter was tried before the undersigned nonjury for two days on June 12 and 13, 2007. Based on the evidence and the arguments presented, the court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52.

## FINDINGS OF FACT

The plaintiff, Lillie Weston, is a seventy-four year old woman, who currently resides in a nursing home in Woodbury, New York. 6/12/07 Tr. at 20. On December 1, 2001, the date of the incident, Weston woke up at 9:00 a.m., had a breakfast consisting of cereal, juice, and a banana, and took Amaryl for her diabetes and medication for hypertension. *Id.* at 26. At 11:00 a.m., Weston was taken by bus service to the Mineola Post Office where she took care of some postal business. *Id.* at 26-27.

After completing her postal business, Weston exited the building and claims to have walked down the steps located to the far right of the plaza. *Id.* at 31; Ex. A-2.[1] Weston further testified that after walking for about five feet, with the assistance of a cane, she caught her foot in a piece of broken pavement and fell. *Id.* at 31; Ex. A-1. Weston described her fall as heavy and very painful, but acknowledged that she did not hit her head. *Id.* at 32-33, 77-79.

After struggling for several minutes to get up from the pavement, Weston stated that

---

[1]The court notes that throughout the trial the parties referred to the plaintiff's three photographs as A-2. For the sake of clarification, the photograph reflecting a close-up of the pavement is exhibit A-1 and the photograph of the front of the post office is exhibit A-2. References to the photographs in this decision correspond to the correct exhibit numbers.

despite the pain she was in, and despite there being a nearby bench and ledge, she walked back up the stairs, across the front entrance of the post office to the opposite side of the plaza where she sat on a ledge to regain her composure. *Id.* at 32-33. She did not seek assistance after falling. *Id.* at 85. Weston sat on the ledge for approximately fifteen minutes and then fell off the ledge experiencing what has been described by both parties as a "syncopic episode", or a brief loss of consciousness. *Id.* at 35-36; Ex. A-1, A-2 and D-8.

Following her fall from the ledge, Weston was taken by ambulance to Winthrop University Hospital ("Winthrop") where she was examined in the emergency room. Ex. F. According to the "Adult Triage Assessment Sheet" for the Emergency Department at Winthrop, Weston was seen at 1:50 p.m. Ex. F- 4. She stated to the triage nurse that she had "'blacked out' just sitting. . . ." *Id.* Weston reported taking medication for high blood pressure and insulin. *Id.* Weston was next seen in the emergency room at 2:30 p.m. Ex. F-3. Weston's account of the incident was recorded in the Emergency Department Record as follows:

> fell from fence she was sitting on - in park Pt was dizzy ⇨ fall
> unknown loc[,] Pt does not know what happened . . . .

*Id.* The hospital performed numerous tests including x-rays of her chest and spine, CAT scans of her head, orbits and cervical spine, and blood tests. Ex. F-7. According to the lab results, Weston's glucose in the emergency room was 171. Ex. F-3. Weston was found to have sustained numerous injuries including, among other things, fractured thoracic vertebrae. Ex. F.

Weston was admitted to the hospital with a diagnosis of syncope and diplopia or double vision. 6/12/07 Tr. at 234; Ex. F-3. On December 3, 2001, two days after she had been admitted, Weston was seen by a pulmonary doctor. Ex. F-1. In his consultation notes, Dr. Mattov recorded Weston's account of the incident:

> 68 yr. old [woman] . . . was admitted on 12-01, after she had an episode of syncope. As per the [patient], on Saturday after finishing her work in the post office she felt "exhausted." Decided to sit down for a few minutes. After about ½ an hour when she 'stood up' she suddenly 'blacked out' within seconds. The [patient] denies preceding chest pain, [shortness of breath] diaphoresis. On waking up, again, the [patient] denied such symptoms. No seizure activity [negative] loss of bowel control. Initial vitals on presentation to ER [temperature] 96.6, [pulse] 101, [respirations] 18, [blood pressure] 160/90. Blood sugar 182. . . .

Ex. F1. At no time during her stay in the hospital did Weston ever report that she had experienced a painful first fall leading up to her fall from the ledge. 6/12/07 Tr. at 144.

The hospital records reflect that doctors attempted to investigate the cause of Weston's syncope, but she refused to submit to several determinative tests including an electroencephalogram study, an electrophysiological test, a tilt table test, and an EKG. *Id.* at 235-236; Ex. F at USPS 189, 249. In fact, a consultation with a psychiatrist was ordered to determine whether she was competent to refuse the testing. *Id.* at 235-36; Ex. F at USPS 278. Thus, the cause of Weston's syncopic episode was not determined during her hospital stay.

At the hospital, Weston was unable to walk unless hospital attendants came for physical therapy. 6/12/07 Tr. at 38. Weston was also put in a hard back brace that extended from her shoulder to her hip and was given a cane. *Id.* at 39-40. After ten or fifteen days, the hard brace was changed to a soft brace. *Id.* at 40. She remained in the hospital for twenty-one days. Ex. F. Weston was discharged on December 20, 2001. Ex. F at USPS 136. The discharge summary again reiterates Weston's account of the events on December 1, 2001 as follows:

> The patient is a resident of an adult living facility. She had a past medical history of diabetes mellitus, hypercholesterolemia, hypertension and the patient was coming into a post office on that date when she fell and hit the left side of her face and socket. She was light headed and weak. She had not eaten earlier in the day but her blood sugar upon admission to the emergency room was 182.

4

> The patient denied loss of consciousness. . . .

*Id.* Upon discharge, Ms. Weston was taken to United Presbyterian Residence, now known as Cold Spring Hills. 6/12/07 Tr. at 41-42. Ms. Weston was confined to a wheelchair from the date of her release until Easter. *Id.* at 42. At the present time, Weston asserts that she can not do extensive walking or sitting. *Id.* at 43. She can't travel because she needs an attendant to fly and has indicated that she has no social life. *Id.* Weston finally testified that she suffers from constant pain in her lower back, elbow, eye, knee, back, and head. *Id.* at 44.

Three postal employees present on the day of the incident testified at trial. The first to testify was Seneca Chapman-Springer ("Chapman"), Supervisor of Customer Services at the Mineola Post Office. 6/13/07 Tr. at 348. Chapman began by describing the physical appearance of the post office at the time of the incident. *Id.* at 349-350. Specifically, Chapman described that in 2001 wooden benches were located in the exact position as the metal benches shown in the government's photo marked D-8. *Id.* at 376-81. The benches partially cover the pavement where Weston claims to have first fallen. *See* Ex. D-8 and A-2.

Chapman described that at approximately 1:15 p.m., postal employee Maureen Guzzo advised her that a women had fallen outside. 6/13/07 Tr. at 357. Chapman went outside with another postal employee, Shirley Joseph, and found Weston on the ground conscious, but face down and covered with dirt. *Id.* at 358-59, 362. Weston told Chapman that she suffered from sugar diabetes, had gotten dizzy and then fell. *Id.* at 362. Weston was then given a soda to drink. *Id.* at 362-63.

Chapman filled out two accident forms concerning the incident. Ex. A and B. In the first form, entitled the "Accident Investigation Worksheet," Chapman reported:

> Customer was seated on ledge of porch in front of the Mineola P.O.

5

> because she was feeling dizzy. She fell backwards over ledge and
> onto the hedges. . . .
>
> Customer was lying face down on lawn in hedges but conscious
> (sp.) and talking. . . .
>
> Customer stated that she was dizzy while exiting the facility and she
> sat down. She had just taken medicine for her diabetes. . . .
>
> Customer was wholly and fully responsible due to her Diabetic
> condition as told to me by the customer herself.

Ex. A. On the second accident form, entitled "Accident Report," Chapman reflected as follows:

> Postal customer Ms. Lillie Weston was sitting on the porch in front
> of the Mineola Post Office on Saturday 12/01/01 at approximately
> 1:00 pm. She had made a purchase at 12:30; however she was still
> outside on the ledge. At 1:10 pm she collapsed and fell over the
> ledge onto the front lawn in the hedges. When I approached her she
> was waking up and she said that she was a diabetic and needed a
> soda." She stated that she had recently taken her medication and
> that she was dizzy. An ambulance was called and she was taken by
> ambulance to Winthrop University Hospital.

Ex. B.

Postal employee Shirley Joseph ("Joseph") testified that on the day of the incident Weston had purchased money orders at her window between 12:30 and 12:45 p.m. 6/13/07 Tr. at 400, 409. She recognized Weston as a regular postal customer. *Id.* at 412. Joseph next noticed Weston sitting on the ledge outside the post office putting items in her pocketbook. *Id.* at 401-02. Shortly after closing time at 1:00 p.m., a group of boys told Joseph that someone outside the post office needed help. *Id.* at 403-05, 356. Joseph notified Chapman, grabbed a cup of water, and went outside to provide assistance. *Id.* at 405. Joseph saw Weston lying face down on the ground behind the ledge she had been sitting on. *Id.* Joseph offered Weston the water, but Weston refused reporting that she had sent boys for soda as she had taken insulin without food and needed something with sugar. *Id.* at 407, 411. Weston drank a soda before being taken to the hospital.

*Id.* at 407, 412. The last postal employee to testify was Maureen Guzzo ("Guzzo"). Guzzo also went outside after learning that someone had fallen and heard Weston say she had taken insulin without food and needed soda to recover. *Id.* at 420, 424.

Both parties presented expert testimony concerning the cause of Weston's fall from the ledge. Weston called Dr. James Liguori, a board certified physician in Neurology, to testify about her injuries. 6/12/07 Tr. at 103. Dr. Liguori first examined Weston in April 2004, several years after the accident. *Id.* at 105. During his examination, Dr. Liguori took a history and physical at which time Weston reported that she had fallen on a patch of broken sidewalk, struck her head in the fall and injured her right leg. *Id.* at 105-07. Weston complained of mid to low back pain and bilateral leg pain with numbness and tingling. *Id.* at 106.

Dr. Liguori performed a Romberg test and an EMG NCV and found Weston's ankle reflexes to be diminished and that she had thoracic muscle spasms and a positive Romberg. *Id.* at 107-09. Dr. Liguori also found evidence of bilateral L4, L5 radiculopathy. *Id.* at 109-10. Dr. Liguori referred Weston for an EEG and an MRI and found evidence of, among other things, compound fractures, arthritis and a disc bulge at L5-S1. *Id.* at 110-12.

Based on his examination of Weston, her account of the accident, and his review of the hospital records, Dr. Liguori concluded that the syncopic episode that caused Weston to fall off the ledge was either caused by a vasovagal event triggered by the head injury sustained from her first fall on the pavement or by a post-contact seizure. *Id.* at 117-18. Dr. Liguori ruled out low blood sugar as a cause of the syncopic episode because Weston's blood sugar upon admission to the hospital was 182 and because she had spontaneously regained consciousness after her fall. *Id.* at 124-25. Finally, Dr. Liguori testified that Weston's thoracic compression fracture, bulging disc, and radiculopathy were caused by both falls. *Id.* at 125-27.

7

Upon being confronted with prior deposition testimony in which Weston conceded that she did not hit her head when she fell on the pavement, Dr. Liguori acknowledged that his opinion that the syncopic episode was caused by head injury was different. *Id.* at 127-30, 134-38, 164. Although Dr. Liguori indicated that if he excluded the head injury as a cause of the syncopic event there could be many reasons why Weston fell off the ledge, he maintained the view that her syncopic episode was caused by the trauma of the first fall. *Id.* at 146-47, 163-65.

The government offered the testimony of Dr. Robert Goldberg. Dr. Golberg is an Osteopath specializing in Physical Medicine and Rehabilitation. *Id.* at 203-04. Dr. Goldberg testified that he examined Weston on October 5, 2004. *Id.* at 208. He testified that Weston complained of headaches, dizziness, pains in her back, her neck, middle and lower regions, difficulty of vision in her right eye, and trouble breathing. *Id.* at 209.

Dr. Goldberg also reviewed the hospital records, took a functional history and performed a physical examination. *Id.* at 216-28. With respect to the functional history, Dr. Goldberg reported that there was no difference in her level of function before and after the incident. *Id.* at 229. With respect to the physical examination, Dr. Goldberg reported that Weston was overweight and had slight swelling between shoulder blades, but had no gibbus deformity, which is often seen after a compression fracture. *Id.* at 229-30. Dr. Goldberg stated that Weston had no muscle spasms in the neck, thoracic region or lower back and that her ability to move her neck was slightly restricted. *Id*. at 230. Dr. Goldberg also performed a gross neurological examination and found that Weston's strength, reflexes and muscle power were normal. *Id.* at 232.

Based on his review of the records and his examination of Weston, Dr. Goldberg concluded that Weston's fall from the ledge was caused by hypoglycemia, a low blood sugar which caused her to become lightheaded and fall off the ledge. *Id.* at 254. He indicated that when

8

an individual takes medicine to improve the efficiency of the body's insulin, as did Weston, and then skips a meal, lightheadness and dizziness typically occur. *Id.* at 258. He further indicated that despite the fact that Weston was hyperglycemic upon admission to the hospital, Weston's blood sugar likely increased due to her consumption of the soda coupled with the trauma from the fall and an elevated white blood cell count. *Id.* at 278, 326. With respect to her injuries, Dr. Goldberg disagreed that Weston had L4-L5 radiculopathy. *Id.* at 269-74.

During cross examination, Dr. Goldberg acknowledged that although his report stated that diabetes was the cause of Weston's syncopic episode and subsequent fall, he could not be certain whether she actually lost consciousness before or because of the fall. *Id.* at 316-19, 325-26.

## CONCLUSIONS OF LAW

Pursuant to the Federal Torts Claims Act, New York Law governs with respect to the claim of negligence before this court. *See* 28 U.S.C. § 1346(b). To prevail on a claim of negligence under New York law, a plaintiff must prove that: (1) the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty; and (3) that the breach proximately caused the plaintiff's injuries. *See Hodder v. United States,* 328 F. Supp. 2d 338, 341 (E.D.N.Y. 2004); *Ducrepin v. United States*, 964 F. Supp. 659, 663 (E.D.N.Y. 1997). New York law further provides that a plaintiff in a slip and fall case must demonstrate that the defendant created the dangerous condition that caused the accident, <u>or</u> that the defendant had actual or constructive notice of the condition. *See Gonzalez v. Wal-Mart Stores, Inc.,* 299 F. Supp. 2d 188, 192 (S.D.N.Y. 2004) (citing *Taylor v. United States,* 121 F.3d 86, 89-90 (2d Cir. 1997)).

In New York, a landowner has a duty "to maintain his property in a reasonably safe condition in view of all the circumstances, including likelihood of injury to others, seriousness of injury, and the burden of avoiding risk." *Harper v. United States,* 949 F. Supp. 130, 132

(E.D.N.Y. 1996)(citing *Basso v. Miller,* 40 N.Y.2d 233, 241 (1976)). The government acknowledges that it had a duty to maintain the post office in a safe condition. The defendant argues, however, that there was no dangerous condition at the post office and that even if a dangerous condition did exist, Weston's injuries were not caused by her having fallen on broken pavement. The court, thus, begins its analysis by answering the question of whether the government breached that duty by creating a dangerous condition or by failing to remedy a condition of which it had constructive notice.

**A. Is There Proof That United States Had Knowledge of a Dangerous Condition Existing Outside the Post Office?**

The plaintiff contends that the United States Postal Service had constructive notice of a defective condition at the Mineola Post Office, that being cracked broken pavement, and that the condition had clearly existed for a period of time as evidenced by patchwork cement "indicating recent attempts to repair the area.[2] Modified Jt. Pretrial Order at 2. "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Gordon v. American Museum of Natural History,* 67 N.Y. 2d 836 (1986). Here, the only evidence offered by the plaintiff with respect to both the existence of the dangerous condition and whether the defendant has notice of the condition, is a photograph of pavement outside of the post office marked A-1. The plaintiff argues, in this regard, that the photograph of the broken pavement reflects that the pavement had been patched or repaired, and thus, the defendant must have been aware of the existence of a dangerous condition.

---

[2]There is no suggestion that the defendant had actual notice of the dangerous condition.

The problem with the plaintiff's argument is that even if the court considered the patched pavement as evidence of constructive notice, the picture of the patched pavement was not taken at the time of the accident. Chapman and Joseph each stated that the plaintiff's photograph of the post office, marked A-2, did not accurately represent the way the front of the post office appeared in December 2001. In particular, they each noted that A-2 depicts the presence of FedEx boxes which were not present in 2001, and further that the photo depicts metal benches not installed until August, 2002. 6/13/07 Tr. at 376-81, 391-93, and 414-15. Although Guzzo testified that A-2 looked the same, she was not asked about the FedEx boxes or the benches, casting doubt on the reliability of her opinion. In fact, it was made clear at trial that the plaintiff did not know when A-2 was taken. *Id.* at 392. The evidence thus reflects that A-2 was taken long after the accident occurred and cannot provide a basis to conclude that the defendant had notice of the condition prior to the accident. *Harper,* 949 F. Supp. at 133 (government deemed to have constructive notice only where evidence shows that condition existed for sufficient length of time prior to accident to permit its employees to discover and remedy condition). The court, therefore, finds that the plaintiff has not proven that the defendant had notice of a defective condition and cannot make out a prima facie case of negligence.

### B. Causation

Although the court's conclusion regarding constructive notice is sufficient to find in favor of the defendant, the court will nonetheless address causation because it was the parties' primary focus at trial. "Proximate cause . . . is defined as that 'which in a natural sequence, unbroken by any new cause, produces an event and without which that event would not have occurred.'" *Wisner v. United States,* 1994 U.S. Dist. LEXIS 17835 * 14 (N.D.N.Y. Dec. 5, 1994)(citing *Winant v. Carefree Pools,* 709 F. Supp. 57, 61 (E.D.N.Y.), aff'd, 891 F.2d 278 (2d Cir. 1989));

11

*see also Hodder,* 328 F. Supp. at 358, n.10. Once a plaintiff has established a prima facie case of negligence, the finder of fact must then be satisfied that "the negligence was a substantial cause of the events which produced the injury." *Wisner* at *16. Here, even if Weston had proven that the government was negligent in maintaining the pavement in front of the post office, Weston has failed to establish that her fall on the alleged broken pavement caused her to ultimately fall off of the ledge.

To begin with, the court finds Weston's description of her fall on the pavement to be contrary to the evidence. Chapman testified that wooden benches were present at the time of the accident and bolted to the ground in the exact same position as the metal benches reflected in photos marked D-14 and D-15. A review of those photos make it doubtful that Weston could have fallen as she described. The location of the relevant bench is such that Weston could not have readily traversed the cracked pavement after coming down the stairs. In addition, Weston's testimony concerning her actions immediately after the fall cast doubt on her account. Although Weston claims to have been in great pain such that it took her almost six minutes to get up, *see* 6/12/07 Tr. at 32-33, 84-85, she nonetheless claims to have climbed back up a half a dozen stairs to sit on a distant ledge when there was a bench at the precise location of her fall and a much closer ledge. *Id.* at 34. Most significantly, Weston never once reported this first painful fall to any postal employee, or any of doctors or nurses who spoke with her about the incident during her twenty-one day hospitalization. The first time Weston appears to have mentioned a first fall was in 2004 to the doctors who examined her in connection with the lawsuit.

Weston did, however, consistently report that when she exited the post office on the date of the incident she felt exhausted and dizzy, sat down on the ledge to rest, blacked-out and fell. *See* Exs. F, F-1, F-3, F-4, A. This version of events is consistent with the testimony of Joseph

who waited on Weston between 12:30 and 12:45 p.m., and thereafter saw her sitting on the ledge rummaging through her purse, after which she became aware that Ms Weston had fallen from the ledge. 6/13/07 Tr. at 400-05, 409.

Finally, although the plaintiff's expert, Dr. Liguori, continued to believe that Weston's fall from the ledge was triggered by trauma, he did acknowledge the possibility that Weston's fall from the ledge could have resulted from low blood sugar, which is what Weston had concluded at the time of the incident. Accordingly, based on all of the evidence presented at trial, the court cannot conclude that the defendant had prior notice of a defective condition or that plaintiff has met her burden of proving that her fall from the ledge and subsequent injuries were caused by the negligence of the defendant.

## CONCLUSION

For the reasons set forth above, the court finds in favor of the defendant. The clerk of the court shall enter judgment accordingly.

Dated: Central Islip, New York  
      June 28, 2007

SO ORDERED:

_____/s/_____  
ARLENE R. LINDSAY  
United States Magistrate Judge